IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 9, 2025

**STATE OF TENNESSEE v. MARLIKKA JORDAN**

**Appeal from the Circuit Court for Rutherford County**
**No. F-84644     Barry R. Tidwell, Judge**

_____

**No. M2023-01352-CCA-R3-CD**

_____

The Defendant, Marlikka Jordan, was convicted by a Rutherford County jury of aggravated child abuse, a Class A felony, and aggravated child neglect, a Class A felony, for which she is serving an effective fifteen-year sentence in confinement. *See* T.C.A. § 39-15-402 (2025) (subsequently amended) (aggravated child abuse and neglect). On appeal, the Defendant contends that the trial court erred in excluding evidence of the victim's injuries observed on or about August 1, 2020, and that the evidence is insufficient to support her convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Kirk D. Catron and Clark D. Palombo (on appeal), Murfreesboro, Tennessee; and Andrew Beasley (at trial), Nashville, Tennessee, for the appellant, Marlikka Jordan.

Jonathan Skrmetti, Attorney General and Reporter; Caroline W. Weldon, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Hugh T. Ammerman and Sharon Reddick, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to a period of time between May and June 2020 when she was the primary caregiver for her nine-month-old son, J.J.,[1] who was found to have sustained multiple fractures during that time.

_____

[1] We will refer to the minor victim in this case by his initials.

At the trial, Sharon Jordan, a licensed clinical social worker at the Children's Hospital at Vanderbilt (the hospital), testified that the hospital consulted with her in suspected child abuse cases and that she contacted the Department of Children's Services (DCS) if she had child safety concerns. She stated that social workers at the hospital served as members of a Child Abuse Response Evaluation (CARE) team and that she was assigned to J.J.'s CARE team during his June 9, 2020, hospital evaluation. Ms. Jordan said that the Defendant was cooperative, calm, and able to comfort J.J. Ms. Jordan recalled that J.J. had both acute fractures and "healing fractures" and that the Defendant did not have any explanation for the fractures. Ms. Jordan said that the Defendant indicated J.J.'s father was "not involved," that J.J. had been with her grandparents a week earlier, and that the Defendant had been with J.J. while she worked from home.

Haneen Ahmad, a former DCS child protective services investigator, testified that she prioritized and evaluated child abuse case referrals. She said that child abuse involving broken bones was given first priority and required a "next steps" determination within twenty-four hours. During this determination period, she and other DCS workers met with the child, the family, and the alleged perpetrator. Ms. Ahmad explained that on June 9, 2020, J.J.'s case was referred to DCS because J.J.'s injuries were considered nonaccidental and that she conducted an evaluation. Ms. Ahmad stated that she learned that J.J., the Defendant, and J.J.'s three-year-old sister and eight-year-old brother lived in an apartment and that the Defendant was J.J.'s primary caregiver. Ms. Ahmad said the Defendant told her that she worked from home due to COVID-19, that she was currently fourteen weeks pregnant, and that her grandparents cared for J.J. before COVID-19. Ms. Ahmad visited the Defendant's grandparents' home to determine if it was a safe placement option for J.J. Ms. Ahmad said that during her initial visit to the Defendant's grandparents' home, the grandparents never mentioned that they had cared for J.J. within twenty-four hours before J.J.'s visit to the hospital. Ms. Ahmad said the Defendant told her that J.J.'s father had never been involved with J.J.

Ms. Ahmad testified that on June 10, 2020, a hospital physician confirmed that J.J.'s injuries were nonaccidental. Ms. Ahmad contacted the Defendant to determine who had been around J.J. during the time of his injuries. During that conversation, Ms. Ahmad learned that J.J.'s great-grandparents had cared for him the weekend before his hospital visit. Ms. Ahmad criticized the Defendant for failing to disclose in their earlier conversation that her grandparents had recently cared for J.J. Ms. Ahmad said that the Defendant responded by saying, "You all are just bad news," after which the Defendant ended the call. Ms. Ahmad said that as a result of this conversation, she reassessed J.J.'s placement. Ms. Ahmad said that on June 12, the Defendant, her children, an aunt, and the Defendant's grandparents attended a meeting at the DCS office to determine a permanent placement plan. Ms. Ahmad confirmed that, at a later date, she participated in a police interview with the Defendant at the Defendant's home. Ms. Ahmad stated that on June 17,

J.J.'s father, David Gilstrap, called the DCS hotline to report abuse. Ms. Ahmad telephoned Mr. Gilstrap and learned that he "had been involved [with J.J.] to some extent." Ms. Ahmad said that the Defendant never explained J.J.'s injuries.

On cross-examination, Ms. Ahmad testified that J.J.'s brother admitted to "rough house" play with J.J. but that no one admitted to abusing J.J. Ms. Ahmad said that the Defendant might have expressed concerns about J.J. being placed with his father and requested that J.J. stay with her grandparents. Ms. Ahmad stated that J.J. was placed with his father on July 22, 2020.

With the jury out of the courtroom, the Defendant asked Ms. Ahmad additional questions as an offer of proof regarding the State's motion to exclude evidence of J.J.'s injuries that were observed on or about August 1, 2020. Ms. Ahmad testified that on August 1, 2020, while J.J. lived with his father, the Defendant contacted her concerning new bruises on J.J.'s back. Ms. Ahmad confirmed that J.J. had bruises on his back and a subconjunctival hemorrhage in his eye, both of which had occurred after J.J.'s visit to the hospital on June 9. Ms. Ahmad stated that the Defendant and her family members continued to have access to J.J. after J.J.'s father took custody of him and that J.J. went into foster care after the new injuries were discovered. The trial court sustained the State's motion to exclude and found that evidence of the additional injuries was not relevant and that, even if it were relevant, it would nevertheless be inadmissible because its probative value was far outweighed by its tendency to mislead the jury and confuse the issues.

Sonya Barbour, a nurse practitioner and primary care provider formerly at Grace Pediatrics, testified that J.J. had been her patient and that he appeared to be healthy and without any musculoskeletal concerns at his post-natal, two-week-old, two-month-old, and six-month-old checkups. Ms. Barbour said that before J.J.'s March 2020 six-month-old checkup, she saw him in January for a respiratory virus at which time he had no physical injuries. Ms. Barbour said that on June 10, she learned that J.J. had been to the hospital for a broken bone from suspected child abuse. She saw J.J., who was accompanied by the Defendant and the Defendant's grandmother, in her office on June 17. Ms. Barbour said that J.J.'s great-grandmother was concerned about the fractures and wanted J.J. tested for brittle bone disease. Ms. Barbour assured J.J.'s great-grandmother that the hospital would perform the necessary tests. Ms. Barbour said that the Defendant never expressed any ideas as to how the injuries occurred. According to Ms. Barbour, the Defendant said that she had taken J.J. to the hospital because of a red spot on the back of his leg and that J.J. had been "running around in his walker" the day before his hospital visit. Ms. Barbour stated that the Defendant never raised a concern about J.J.'s pulling his hair. Ms. Barbour confirmed that J.J. was not seen again at Grace Pediatrics after June 17. On cross-examination, Ms. Barbour stated that the Defendant accompanied J.J. on his seven visits to Grace Pediatrics and that the Defendant appeared to care about her children's health.

Smyrna Police Department (SPD) Detective Marcy Gossett testified that she investigated the allegations of J.J.'s child abuse. Detective Gossett and SPD Detective Jason Anderson interviewed the Defendant at her apartment, and an audio recording of the interview was played for the jury. In the interview, the Defendant said that J.J. had stayed with his great-grandparents for a couple of nights before his June 9, 2020 visit to the hospital and that they returned him to the Defendant on Monday afternoon, June 8. The Defendant said that on Monday afternoon J.J. "sat around and played," moved around in his walker, and did not appear to be in pain. She said that she bathed J.J. on Monday night, that he did not appear to be in pain, and that his leg did not appear swollen or bruised. She said that J.J. went to bed at 7:00 p.m. Monday night and awoke crying around 3:00 a.m. Tuesday morning with a swollen and bruised leg, at which time she gave him Tylenol and took him to the hospital. She initially thought that J.J. was suffering from a spider bite. The Defendant confirmed that J.J. regularly saw a pediatrician at Grace Pediatrics and that none of her other children had ever experienced bone fractures. She said she did not know what caused J.J.'s injuries. She said that J.J. never indicated he was in severe pain until early Tuesday morning. The Defendant said that her eight-year-old son routinely carried J.J. but that she doubted he dropped or otherwise injured J.J. The Defendant said she was not aware as to whether J.J. was prone to bone fractures. Although the Defendant stated that J.J. could "slide off stuff" like the sofa, she had no indication before Tuesday morning that he had ever injured himself. The Defendant said J.J.'s father did not want to be involved with J.J.'s care. On cross-examination, Detective Gossett acknowledged that a table in the apartment's living room had sharp edges. Detective Gossett said she interviewed Mr. Gilstrap on June 24, and he said he last saw J.J. on May 31.

David Gilstrap testified that he visited J.J. at the Defendant's apartment on two occasions and once at Mr. Gilstrap's apartment on May 31, 2020, when he spent approximately one and one-half hours with J.J. Mr. Gilstrap said that he and the Defendant had an "on-going argument" regarding visitation. Text messages between the Defendant and Mr. Gilstrap dated May 1 through June 9 were received as an exhibit. The text messages regarded scheduling a time when Mr. Gilstrap could visit J.J. Mr. Gilstrap said that he became frustrated because the Defendant repeatedly cancelled his visitation plans. Mr. Gilstrap said that when J.J. was with him on May 31, J.J. was "crying a little bit," which he attributed to J.J.'s being in an unfamiliar place with an unfamiliar person.

Mr. Gilstrap testified that he planned to visit J.J. again on June 7, 2020, but that, at 9:04 p.m., on June 6, the Defendant sent Mr. Gilstrap a text message canceling the visit. The Defendant's June 6 text message stated, ". . . [J.J.'s] been running a fever today and I think he has a ear infection and I need to take him to the doctor so I gave him some meds to see how he does over night but if he's not well I'm takin him to the doctor." The Defendant's next text message stated that she believed J.J. had gotten sick from being outside at a park. The Defendant's text message dated June 7, at 4:35 a.m., stated that J.J. had "been up all night crying" and a later message that day at 12:17 p.m. stated that she

was taking him to the doctor. At 6:02 p.m. the Defendant sent a text message stating that J.J. "has an ear infection and a virus" and the Defendant included a photograph of J.J. showing where J.J. had been pulling out his hair. The Defendant's text message dated June 8 stated that J.J. had a fever "on a[nd] off," was on antibiotics, was "doing better," and that "[t]he doctors said it's normal just watch him cause he's frustrated and [had] high fevers and sick." The Defendant's text message dated June 9, at 5:52 a.m., stated that she was "taking [J.J.] back to the ER now he's been up all night and fever is 104." Later text messages from the Defendant on June 9 included a photograph taken at the hospital of J.J.'s swollen leg, and the Defendant told Mr. Gilstrap that J.J. had a fractured leg. When the Defendant asked in a text message whether any of Mr. Gilstrap's family members had "softening of the bones," Mr. Gilstrap replied, "Not that I'm aware of!"

Mr. Gilstrap testified that he felt angry because the Defendant refused his requests to telephone him about J.J. and that the Defendant described J.J. as "an angry baby." Mr. Gilstrap said that after he learned that J.J. was pulling his hair and had a swollen leg, Mr. Gilstrap contacted DCS and learned that J.J. had multiple bone fractures. On cross-examination, Mr. Gilstrap acknowledged that he had cancelled some visits with J.J. and that Mr. Gilstrap had a vitamin D deficiency, for which he used to take prescription medication. Mr. Gilstrap stated that his then-girlfriend was present during his May 31, 2020 visit with J.J.

Dr. Kavita Vankineni, a hospital pediatrician and expert in child abuse pediatrics, testified that she was a member of J.J.'s CARE team. Dr. Vankineni said that she was consulted after the emergency department physician suspected J.J.'s injuries were the result of "maltreatment." Dr. Vankineni recalled that the Defendant said that she brought J.J. to the hospital because J.J. was fussy, that she had given him Tylenol, and that she suspected he was teething. Dr. Vankineni acknowledged that it was possible for a nine-month-old child to accidentally break a bone because someone dropped the child or because the child rolled off a bed or other furniture.

Dr. Vankineni testified that an X-ray of J.J.'s swollen left leg showed a fracture of the bone into several pieces just below the knee. Dr. Vankineni agreed that the bone was broken with enough force to "move the bone and displace it within [J.J.'s] leg." Dr. Vankineni said that she would not expect a nine-month-old child to be able to use a roller walker with a leg fracture of this nature because putting weight on, or even moving, the fractured leg would cause "extreme pain."

Dr. Vankineni testified that she typically asked about a child's medical and family history, ordered radiological imaging, and recommended laboratory tests. She said the most important considerations regarding suspected abuse were how the injury occurred and the type, location, and age of the fracture. She explained that imaging would show if a fracture was healing. Dr. Vankineni explained that an acute fracture was one that occurred

-5-

within the last five to seven days and showed no evidence of healing, while a subacute fracture showed "a little bit of possible healing" and occurred after the acute phase. Dr. Vankineni said that in cases of suspected child abuse, a skeletal survey is conducted which includes twenty-one different X-ray images of all the bones in a child's body. Dr. Vankineni explained that J.J.'s first skeletal survey revealed a "remote healed" fracture of the distal left leg, a healing right shoulder fracture, a subacute right knee fracture, an acute right wrist fracture, a healing left wrist fracture, and a possible left proximal fibula (leg) fracture, all of which were in addition to J.J.'s acute left proximal tibia comminuted (leg) fracture. On June 23, 2020, J.J.'s second skeletal survey showed four additional acute fractures on his hands and left arm. Dr. Vankineni said that a CT scan revealed a skull fracture of J.J.'s occipital bone and that, in addition to the fractures, J.J. also had an injury to his mouth that was "consistent with a blunt impact to the face." Dr. Vankineni identified photographs of J.J.'s left leg and mouth, which were received as an exhibit.

Dr. Vankineni testified that J.J.'s fractures were sustained on more than one occasion and that each fracture would have caused pain. Dr. Vankineni concluded that J.J.'s injuries were due to "nonaccidental trauma." She based her opinion on "[t]he number of the fractures. The fact that some were old, some were new. The locations of the fractures. No history of injury for these fractures. And then also the [mouth] tear and the [knee] bruise." Dr. Vankineni stated that tests showed J.J. did not have brittle bone disease and that the mineral composition of his bones was normal.

On cross-examination, Dr. Vankineni testified that the fractures to J.J.'s left tibia, left fibula, and right wrist were acute fractures and that his right tibia had a subacute fracture. Dr. Vankineni said that the X-rays showed the fractures to J.J.'s right shoulder and left wrist were healing, which occurred approximately five to seven days after an injury. Dr. Vankineni acknowledged that she never witnessed any abuse to J.J. and that the Defendant denied injuring J.J. Dr. Vankineni stated that on June 19, 2020, she ordered the test for brittle bone disease but that she did not order a bone density scan. Dr. Vankineni stated that she did not have any contact with J.J.'s father. On redirect examination, Dr. Vankineni explained that although skull fractures were difficult to date, the CT scan showed swelling of the tissue around J.J.'s skull fracture, which typically occurred anytime within one week of this type of injury. Dr. Vankineni stated she was never concerned that J.J. had brittle bone disease because children with this disorder typically have distinct characteristics that J.J. did not have. Dr. Vankineni said that the radiological reports did not indicate any concerns about J.J.'s bone density and that she did not feel a bone density scan was warranted.

Mae Jordan, the Defendant's grandmother, testified that she previously had worked as a licensed practical nurse for over twenty years and had retired from the Veteran's Administration Hospital when she became disabled. Ms. Jordan stated that she raised the Defendant. Ms. Jordan said that she cared for J.J. from June 5 to June 7, 2020, the weekend

before he was taken to the hospital, and that "normally" she saw J.J. and his siblings at least three times a week. Ms. Jordan said that the Defendant told her that J.J. was "fussy," that Ms. Jordan assumed J.J. was teething, and that Ms. Jordan picked up J.J. and took him to her home. Ms. Jordan said that J.J. had a low-grade fever, that she gave him Tylenol, and that he would then "pep up" and "crawl around all over the place." She said J.J. became fussy when the Tylenol wore off. Ms. Jordan stated that J.J. had "no outward signs" of multiple fractures. Ms. Jordan explained that when she returned J.J. to the Defendant, J.J. "seemed fine."

Ms. Jordan testified that the Defendant called her early on the morning of June 9, 2020, saying that J.J. had a spider bite and that she was taking him to the hospital. Ms. Jordan said that on a previous occasion, the Defendant had seen a spider on J.J.'s crib. Ms. Jordan recalled that after J.J. was released from the hospital, Ms. Jordan accompanied J.J. and the Defendant to Grace Pediatrics to ask J.J.'s pediatrician about his injuries. She said that while she sought additional medical testing for J.J., DCS took custody of J.J. Ms. Jordan confirmed that she never saw the Defendant hit or neglect J.J. and that she would not tolerate abusive or neglectful behavior. Ms. Jordan acknowledged that she would have taken J.J. from the Defendant if Ms. Jordan suspected abuse or neglect and reiterated that no one noticed that J.J. had any injuries before June 9.

Kendall Cummings, the Defendant's daughter's grandfather, testified that he never saw the Defendant abuse or neglect Mr. Cummings's granddaughter and that he routinely saw the Defendant's children "every other weekend or so" and never observed "any problems."

The Defendant testified that she was J.J.'s primary caregiver and took him to Grace Pediatrics for regular pediatric appointments. The Defendant stated that she never abused or neglected J.J. The Defendant said that Mr. Gilstrap was not initially interested in being part of J.J.'s life and that her grandparents assisted with childcare. The Defendant confirmed that she left J.J. with Mr. Gilstrap on May 31, 2020. The Defendant said she became aware that something was wrong with J.J. on June 6, 2020, when he seemed "real fussy" but that she did not notice any swelling or bruising until June 9. The Defendant acknowledged that neither of her other two children had ever broken any bones. The Defendant said that she contacted her grandmother, told her that she thought J.J. had been bitten by a spider, and took J.J. to the hospital. The Defendant said that after her visit to the hospital, she and her grandmother took J.J. to Grace Pediatrics for a follow-up appointment and to seek an explanation for J.J.'s injuries. The Defendant noted that her other children were "very careful" with J.J., although her older son could be "kind of rough" at times.

On cross-examination, the Defendant testified that she did not have a good relationship with Mr. Gilstrap and that his attempts to visit J.J. were excuses for trying to

pursue a romantic relationship with her. She believed that J.J.'s father contacted DCS to "get back" at her for not wanting a relationship. The Defendant said that her grandmother picked up all the children on Saturday, June 6, 2020, for the weekend, that she spent the night at her grandparents' home on June 7, that she left by herself to work from home on Monday, June 8, and that her grandmother and sister brought the children to the Defendant's home on Monday afternoon. The Defendant said that she told DCS that she was with the children at her grandparents' home. The Defendant acknowledged that she incorrectly told J.J.'s father in a text message that J.J. had been treated for an ear infection and that a physician said J.J. had a spider bite. The Defendant said that she took J.J. to be treated for a suspected ear infection but that the hospital waiting time was so long that she left. The Defendant stated that although J.J. was never diagnosed with an ear infection, about a week before June 9, she gave him "old medication" that she had at her home from a prior ear infection. The Defendant said that her other children had a virus, that she had COVID-19 around June 9, and that she assumed J.J. had a virus.

On redirect examination, the Defendant testified that as of June 9, 2020, no parenting plan was in place, making it difficult to work out J.J.'s visitation. The Defendant reiterated that she and her grandmother sought additional testing for J.J. because J.J. had no outward signs of injuries and because her grandmother had been the only other caregiver.

The jury found the Defendant guilty of one count of aggravated child abuse and one count of aggravated child neglect, and the trial court sentenced the Defendant to serve an effective fifteen-year sentence in confinement. The Defendant filed a motion for new trial, in which she alleged "that her trial was fundamentally unfair and her constitutional rights were violated." The court denied the Defendant's motion after a hearing. A transcript of that hearing is not included in the appellate record. This appeal followed.

The Defendant alleges that the evidence at the trial was insufficient to support her convictions because no evidence was presented to establish that the Defendant injured J.J. The Defendant also alleges that the trial court erred by excluding evidence of any injuries to J.J. that were observed on or about August 1, 2020. The State counters that evidence at the trial is sufficient to sustain the convictions. The State further argues that the Defendant has waived her claim regarding the trial court's exclusion of evidence because she failed to raise it in her motion for new trial and that, regardless, the excluded evidence did not prevent the Defendant from presenting a defense.

# I

## Exclusion of Evidence

We consider, first, the Defendant's claim that the trial court erred in excluding evidence of J.J.'s injuries observed on or about August 1, 2020. We note that the Defendant did not file a reply brief to address the State's argument that she waived this claim for failing to raise it in her motion for new trial and for failing to provide a transcript of the motion for new trial hearing.

Issues not raised in a motion for new trial, other than sufficiency of the evidence and sentencing, are waived and not reviewed on appeal. *See* Tenn. R. App. P. 3(e); *State v. Parker*, 350 S.W.3d 883, 900 (Tenn. 2011) (holding that the defendant waived her claim that the trial court erred in admitting evidence at the trial because she failed to raise that claim in her motion for new trial). Here, the Defendant filed a motion for new trial in which her only allegation was that "her trial was fundamentally unfair and her constitutional rights were violated." The Defendant reserved the right to amend her motion but did not amend it. The trial court's written order denying the motion for new trial states that the court held a hearing on the matter, at which time the court ruled from the bench based upon the grounds stated on the record. However, the transcript of that hearing is not included in the appellate record. The Defendant, as the appellant, has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. T.R.A.P. 24(b); *see State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); *State v. Stack*, 682 S.W.3d 866, 876 (Tenn. Crim. App. 2023). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, if the appellate record is incomplete, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). We also note that the Defendant in this case did not move to supplement the deficient record with the transcript of the motion for new trial hearing. Accordingly, the Defendant's claim regarding the trial court's exclusion of evidence is waived.

# II

## Sufficiency of the Evidence

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"It is well established that the identity of the perpetrator is an essential element of any crime." *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2021). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). We apply the same standard of review, whether the evidence is direct or circumstantial. *Dorantes*, 331 S.W.3d at 379.

In relevant part, "[a] person commits the offense of aggravated child abuse [or] aggravated child neglect . . . who commits child abuse, as defined in § 39-15-401(a) [or] child neglect, as defined in § 39-15-401(b)... and ... [t]he act of abuse, [or] neglect ... results in serious bodily injury to the child." T.C.A. § 39-15-402(a)(1). "'Serious bodily injury to the child' includes . . . a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, [or] injuries to the skin that involve severe bruising . . . ." *Id.* § 39-15-402(c).

Generally, the offenses are Class B felonies, but the offenses are Class A felonies if the abused or neglected child is eight years of age or less. *Id.* § 39-15-402(b). A person commits a form of child abuse "who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* § 39-15-401(a) (2018) (subsequently amended). A person commits a form of child neglect "who knowingly abuses or neglects a child under (18) eighteen years of age, so as to adversely affect the child's health and welfare[.]" *Id.* § 39-15-401(b). A person acts "knowingly" with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that

-10-

the conduct is reasonably certain to cause the result. *Id.* § 39-11-106(a)(20) (2018) (subsequently amended); *see id.* § 39-11-302(b) (2025).

The Defendant alleges that no evidence at the trial showed that the Defendant caused J.J.'s injuries. Our supreme court has held that the identity of a perpetrator is a question of fact for the jury to determine and that it may be established by circumstantial evidence. *See Reid*, 91 S.W.3d at 277; *Thomas*, 158 S.W.3d at 388. In the present case, Dr. Vankineni testified that X-rays taken in June 2020 showed that J.J. had multiple fractures in varying stages of healing, meaning that they occurred over a period time, and that each fracture would have caused pain. Dr. Vankineni opined that J.J.'s acute and subacute fractures occurred within approximately five to seven days of J.J.'s first X-ray and that some fractures were older. The Defendant admitted to being J.J.'s primary caregiver during this time period. The only time J.J. was with his father was the afternoon of May 31, 2020. Dr. Vankineni also concluded that J.J.'s injuries were nonaccidental. She based her conclusion on the number, location, age, and type of fractures identified on the X-rays. Radiological evidence established that J.J. had fractures on his legs, right shoulder, hands, wrists, and skull, as well as an injury to his mouth consistent with blunt force trauma. The Defendant had no explanation for J.J.'s injuries.

The jury weighed testimony from the Defendant, J.J.'s father, J.J.'s great-grandmother, social workers, and physicians and concluded that the Defendant was the perpetrator of J.J.'s abuse and neglect. From the evidence, a rational jury could conclude beyond a reasonable doubt that the Defendant had custody and control of nine-month-old J.J. at the time of his injuries, that the Defendant knowingly inflicted injury to and neglected J.J., that the Defendant failed to seek treatment for J.J.'s injuries, and that J.J. suffered serious bodily injury and adverse health consequences as a result. Accordingly, the evidence is sufficient to support the Defendant's convictions for aggravated child abuse and aggravated child neglect.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

**s/Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE